IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**JOHN COPELAND,**
**ON BEHALF OF A.C.,**

                                          Case No. 1:16 CV 556

        Plaintiff,

        v.                                 Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

        Defendant.                    MEMORANDUM OPINION AND ORDER

### INTRODUCTION

Plaintiff John Copeland ("Copeland") filed a Complaint against the Commissioner of Social Security ("Commissioner") on behalf of his son, A.C. ("Plaintiff"), seeking judicial review of the Commissioner's decision to deny supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 13). For the reasons stated below, the undersigned affirms the decision of the Commissioner.

### PROCEDURAL BACKGROUND

Copeland filed an application for SSI on behalf of Plaintiff on March 5, 2013, alleging a disability onset date of July 1, 2011. (Tr. 172-75).[1] The claims were denied initially and upon reconsideration. (Tr. 135-37, 143-45). Copeland then requested a hearing before an administrative law judge ("ALJ"). (Tr. 150). On February 11, 2015, Copeland appeared and

---

1. Copeland had previously applied for SSI on behalf of Plaintiff in December 2011 and August 2012. *See* Tr. 62, 117. Both times, the application was denied and he did not appeal. *Id.*

testified in Cleveland, Ohio, at a hearing before the ALJ. (Tr. 82-105). On March 11, 2015, the

ALJ found Plaintiff not disabled in a written decision. (Tr. 62-77).[2] The Appeals Council denied

Copeland's request for review, making the hearing decision the final decision of the

Commissioner. (Tr. 1-6); 20 C.F.R. §§ 404.955, 404.981. In denying the request for review, the

Appeals Council noted:

> We also looked at medical records from Ohio Guidestone, dated March 12, 2015
> through May 13, 2015. The Administrative Law Judge decided your case through
> March 11, 2015. This new information is about a later time. Therefore, it does not
> affect the decision about whether you were disabled beginning on or before
> March 11, 2015.
>
> If you want us to consider whether you were disabled after March 11, 2015, you
> need to apply again.

(Tr. 2). Copeland filed the instant action on behalf of Plaintiff on March 8, 2016. (Doc. 1).

**FACTUAL BACKGROUND**[3]

***Medical Records***

In February 2013, Plaintiff saw Dr. Peter Corpus at the Center for Families and Children

("CFC"). (Tr. 298). The chief complaint was "continued hyperactivity and aggression in the PM"

but "[b]ehavior [was] good at school." *Id.* Dr. Corpus noted Plaintiff's diagnoses of ADHD and

ODD, discontinued Ritalin, and started Adderall in the afternoon. (Tr. 299). He recommended

Community Psychiatric Supportive Treatment ("CPST") service ("in home therapy to help the

mother set better parameters and boundaries[.]"). *Id.*

---

2. The ALJ first dismissed the request for a hearing through the date of the decision on Plaintiff's
second application (October 16, 2012), based on *res judicata*. (Tr. 62). He then stated he was
considering the current claim based on the application filing date of March 5, 2013. *Id.*
3. The undersigned summarizes the portions of the record relevant to the arguments raised by
Copeland. *See Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) (arguments
not raised in opening brief considered waived).

In March 2013, Copeland reported to Dr. Corpus his concern about Plaintiff's non-volitional vocalizations, and continued oppositional behaviors at home. (Tr. 300). Dr. Corpus continued diagnoses of ADHD and ODD. (Tr. 301).

At an appointment at CFC in April 2013, Vince Caringi, M.D., noted Plaintiff had a history of temper tantrums occurring when Plaintiff did not get his way. (Tr. 319). Adderall was "working well and lasting through the school day", with teachers also reporting improvement. *Id.* Dr. Caringi continued Plaintiff's medications and recommended individual behavioral health counseling. (Tr. 320). At a follow-up appointment in June, Plaintiff reported the school year ended "awesome" and his mother reported he had a good final report card. (Tr. 321). She also reported "a few more episodes of acting out near the end of the year." *Id.*

In August 2013, Dr. Caringi noted Copeland stated "summer has been filled with 'ups and downs' with [Plaintiff's] behavior" and that Plaintiff's "moods have been shifting more rapidly". (Tr. 333). Copeland also reported an increase in obsessive behavior, including repeating sounds. *Id.* A questionnaire Dr. Caringi submitted that same day indicated Plaintiff had daily hyperactivity and impulsivity as well as frequent oppositional and defiant behavior. (Tr. 335). Plaintiff responded to his psychiatrist in a "generally appropriate" way but "require[d] redirection" and had difficulty completing tasks. *Id.* Plaintiff's response to treatment was noted to be "fair". (Tr. 338).

Plaintiff's mother completed a "Case History Form" in late August 2013. (Tr. 349). She indicated Plaintiff had some speech problems, and that he became frustrated by them. (Tr. 349, 353). Plaintiff's mother also indicated Plaintiff had a high activity level, difficulty following directions and maintaining attention, impulsivity, was aggressive and had behavior problems, and was both overly sensitive to stimuli and had a low response to stimuli. (Tr. 357).

In October 2013, Plaintiff again saw Dr. Caringi. (Tr. 422). His mother reported "some trouble with peers during recess" and "ongoing concern for mood swings and persistent irritability." *Id.* In November 2013, Dr. Caringi noted Plaintiff's parents reported his school performance was better but "anger and violence" was worse with more difficulty with frustration tolerance and mood swings. *Id.* Copeland also "admit[ted] that they have not been adherent to counseling/therapy." *Id.*

Also in October 2013, Plaintiff underwent a Mental Health Assessment at Metro Health Medical Center with Deborah Casciato, MSSA, LISW-S. (Tr. 435-39). Plaintiff's parents reported that medication (Adderall twice per day and Intuniv once per day) was helpful, but that Plaintiff continued to have behavioral problems. (Tr. 435). Plaintiff had outbursts, yelled, did not like change, and had to be bribed and coaxed to get ready for school. *Id.* However, once at school, he would get out of the car without a problem. *Id.* Plaintiff's parents reported he has lots of friends in his neighborhood and classroom, but is sometimes teased and gets aggressive with peers. (Tr. 436). His parents thought he was not trying at school, which resulted in poor grades. (Tr. 437). Diagnosis was disruptive behavior disorder, not otherwise specified. *Id.*

Later that same month, Plaintiff's parents saw Nikhil S. Koushik, Ph.D. (Tr. 442-46). They reported Plaintiff was violent, angry, and oppositional at home—arguing, interrupting, and hitting his mother. (Tr. 442). Copeland reported working on behavioral contingencies at CFC and he perceived that to be helping. *Id.* Plaintiff does "very well" academically, but recently had not been completing his work, or refusing to do his work. (Tr. 444). Plaintiff's parents reported rewarding Plaintiff with money for good behavior at school. (Tr. 445). He also helped at home by taking out the dog, cleaning up after himself, and helping with the dishes. *Id.* Plaintiff's behavior was better at school than at home. (Tr. 446). Dr. Koushik diagnosed ADHD, ODD,

mood disorder, not otherwise specified, and assigned Plaintiff a GAF score of 61-70[4], indicating "[m]ild symptoms." *Id.*

In November 2013, Plaintiff saw Dr. Florence V. Kimbo, M.D. (Tr. 450-52). Copeland reported Plaintiff was hyperactive, aggressive toward his mother, had broken things, damaged walls, and thrown objects at the television. (Tr. 450). Since Plaintiff stopped seeing his therapist at CFC, his anger had gotten worse. *Id.* Diagnoses were ADHD-Combined Subtype by history, mood disorder (not otherwise specified), conduct disorder childhood onset, and questionable autism spectrum disorder. (Tr. 452). Dr. Kimbo noted Plaintiff was to continue current medications, discussed the possibility of Adderall making aggression worse, and noted Plaintiff "[w]ill need a therapist." *Id.*

Progress notes from an appointment with Dr. Koushik, in December 2013 state Copeland "indicated he has been trying to be more firm with contingencies which has been helping." (Tr. 470). One of Plaintiff's anger triggers was having to wait or be patient. *Id.* Dr. Koushik encouraged Copeland to "double reward him for waiting" ("if he waits until the next day for something and is able to stay calm he gets the original privilege and then a bonus privilege"). *Id.* Plaintiff was "very compliant with examiner requests", "was polite and followed instructions well" and "stayed calm even when examiner broke a few rules or enforced his own rules." (Tr.

---

4. The GAF scale represented a "clinician's judgment" of an individual's symptom severity or level of functioning. Am. Psych. Ass'n, *Diagnostic & Statistical Manual of Mental Disorders,* 32–33 (4th ed., Text Rev.2000). "The most recent (5th) edition of the Diagnostic and Statistical Manual of Mental Disorders does not include the GAF scale." *Judy v. Colvin,* 2014 WL 1599562, at *11 (S.D. Ohio); *see also* Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013) ("DSM–V") (noting recommendations "that the GAF be dropped from [DSM–V] for several reasons, including its conceptual lack of clarity ... and questionable psychometrics in routine practice"). However, as set forth in the DSM—IV, a GAF score of 61-70 indicated [s]ome mild symptoms (*e.g.,* depressed mood and mild insomnia)" or "some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well."

471). Dr. Koushik assessed ADHD-Combined Type, ODD, and mood disorder not otherwise specified. *Id.* Plaintiff was again assessed with a GAF score of 61-70, indicating "[m]ild symptoms." *Id.*

On December 16, 2013, Plaintiff again saw Dr. Kimbo. (Tr. 481). Plaintiff reported he was in the second grade, liked his teacher, and had friends at school. *Id.* He also "talked about playing C[a]ll of Duty and described how it had 7 chapters" and said he has both an X-Box and a Wii-U at home. *Id.* He was "fidgety but remain[ed] seated" and was cooperative during the appointment. (Tr. 482). Dr. Kimbo continued prior diagnoses. *Id.*

In January 2014, Dr. Koushik noted Plaintiff's mother had been off work and school for a few weeks and "things have been a lot better" with Plaintiff better able to manage his temper. (Tr. 487-88). Plaintiff had anxiety symptoms, and struggled with transitions (being told to stop playing video games or watching movies). (Tr. 488).

In February 2014, Plaintiff reported to Dr. Koushik that he had been getting angry two to three times per week but had not been destroying things. (Tr. 519). Instead, he would go to his room and hit, stomp, or yell into his pillow. *Id.* Plaintiff's mother confirmed that he was doing a better job of managing his anger, and was somewhat better at transitions. *Id.* Dr. Koushik noted information from Plaintiff's teacher "indicate[d] sub-clinical thought problems at school (i.e., frequently having trouble getting off topics, occasional strange behaviors), but no difficulties in other areas", a "preoccupation with gaming", "difficulty transitioning between activities" and hitting. *Id.* Diagnoses were anxiety disorder (not otherwise specified), ADHD by history, ODD per history, rule out obsessive compulsive disorder, and rule out separation anxiety disorder. Again, Dr. Koushik assessed a GAF of 61-70 indicating "[m]ild symptoms." (Tr. 521).

In March 2014, Nakita Heard, LSW, Case Worker, at Ohio Guidestone, performed a mental health assessment. (Tr. 568-75). Ms. Heard noted Plaintiff was hyper and unable to engage with her or maintain focus. (Tr. 568). Plaintiff's parents reported he is aggressive toward peers and family members, and will destroy their things—but not his own—when he becomes upset. *Id.* Plaintiff was reported to enjoy playing with Legos, playing video games, and was involved with Boy Scouts. (Tr. 569). The parents reported taking things away as punishment but that Plaintiff becomes upset ("has kicked holes in the wall, thrown objects at the tv, and . . . thrown objects at the wall") and that Plaintiff "will manipulate them causing them to give his belongings back [to] him." *Id.* A mental status examination showed intense eye contact, agitated activity, clear speech, full affect, loss of interest, average intelligence, hyperactive behavior, and impaired attention/concentration. (Tr. 572). Ms. Heard assessed Plaintiff's symptoms as "severe" and his level of functioning impairment as "serious". (Tr. 573). Ms. Heard explained Plaintiff "would benefit from outpatient counseling services to address his ongoing mental health symptoms and the family could benefit from CPST services." *Id.*

Later in March 2014, Plaintiff saw Dr. Kimbo, where his parents reported Plaintiff's teachers sent home notes about "aggressive behavior [and] not keeping hands to himself." (Tr. 542). Plaintiff was not listening at home, "annoys" other kids, and had hurt the dog at his uncle's house. *Id.* Dr. Kimbo increased Plaintiff's Adderall dosage, continued prior diagnoses, and assessed a GAF score of 65. (Tr. 543).

In July 2014, Plaintiff was seen by Sonia Stanford, QMHS[5], Case Worker, at Ohio Guidestone, who established a treatment plan. (Tr. 558-65). Problems included aggressive

---

5. The Ohio Administrative Code defines "Qualified mental health specialist" (QMHS) as "an individual who has received training for or education in mental health competencies and who has demonstrated, prior to or within ninety days of hire, competencies in basic mental health skills

behaviors, difficulty dealing with life stress, impulsive behaviors, and behaviors interfering with friendships. (Tr. 558). Diagnoses were ADHD and ODD. (Tr. 559). Treatment goals were: reducing aggressive behaviors and stabilizing mood, *id.*; reduce frequency and intensity of anxiety responses (Tr. 561); and maintain attention to a situation or task in spite of distractibility, fatigue, or boredom (Tr. 563). Later that month, Colleen Grabowski, PCC-S, completed a "medical necessity determination" and stated Plaintiff's symptoms were severe and that his level of functioning impairment was serious. (Tr. 566-67). His areas of functioning impairment included school, family relations, social, and mood. (Tr. 567).

At an appointment with Dr. Kimbo in September 2014, Dr. Kimbo noted Plaintiff was "talkative, very hyperactive, rocking in the chair and leaning it dangerously backwards". (Tr. 590). Attention was "sustained." *Id.* Dr. Kimbo adjusted Plaintiff's medications and continued prior diagnoses. *Id.* She also assigned a GAF score of 65, indicating mild symptoms. *Id.*

In December 2014, Dr. Kimbo wrote a letter to the principal of Plaintiff's school (at the request of Plaintiff's parents) in support of a multi-factored evaluation for special education. (Tr. 626-27). Dr. Kimbo stated she believed this was necessary due to speech/language issues, attention/concentration/focus issues, impulsivity, and getting along with others. (Tr. 626).

### Opinion Evidence

In April 2013, state agency reviewing physician Mel Zwissler, Ph.D., concluded Plaintiff's impairments did not functionally equal a listed impairment because Plaintiff had marked limitation in the domain of interacting and relating with others, but less than marked

---

along with competencies established by the agency, and who is not otherwise designated as a provider or supervisor, and who is not required to perform duties covered under the scope of practice according to Ohio professional licensure . . . ." *See* Ohio Admin. Code 5122–2401 (Sept. 7, 2011); *see also Beckstedt v. Comm'r of Soc. Sec.*, 2015 WL 235193, at *7 (S.D. Ohio), report and recommendation adopted by 2015 WL 545157 (S.D. Ohio) (noting QMHS definition).

limitation in acquiring and using information, attending and completing tasks, and caring for oneself. (Tr. 120). Dr. Zwissler also concluded Plaintiff had no limitation in health and physical well-being, and moving about and manipulating objects. *Id.* In August 2013, state agency reviewing physician Carl Tishler, Ph.D., affirmed Dr. Zwissler's conclusions. (Tr. 131-32).

In October 2014, Ms. Stanford completed a questionnaire regarding functional equivalence. (Tr. 602-05). In it, she noted she had known Plaintiff since May of that year. (Tr. 602). She opined Plaintiff had marked limitations in acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for self. (Tr. 602-04). Ms. Stanford reported she provided weekly in-home services to Plaintiff. (Tr. 604). In response to the question of "[i]f this is an episodic disorder, how often and for how long does it interfere with [Plaintiff's] functioning?", she replied "[n]ot in my scope of practice to answer." *Id.*

***Education Records***

Plaintiff had an Accommodation Plan in place for the first grade year (2012-13). (Tr. 243).[6] It included: 1) being seated near the teacher to maintain focus during group activities, and to take tests; 2) if distracted while working, he would be given the option of completing his work at the table or in an empty desk; 3) permission to stand at his desk or kneel on his chair, if needed; 4) subtle cues ("a wink or thumbs up") when he is on task and subtle cues ("a hand on his back or the teacher in close proximity to him") when he needs to focus; 5) being asked to repeat directions to verify comprehension; and 6) being assigned an emergency drill buddy to ensure he stays with the class during drills. *Id.*

A weekly progress report from late February 2013 stated Plaintiff had been in trouble for talking during a fire drill, and that his teacher had noticed more instances of Plaintiff "making

---

6. This one-page "Accommodation Plan" is unsigned, but Plaintiff's teacher attached it to an evaluation she completed in June 2013. *See* Tr. 241 ("Accommodation Plan enclosed.").

random vocalizations", which the teacher did not believe he could control. (Tr. 200). The teacher rated Plaintiff's actions in: 1) following class rules; 2) completing work neatly and on time; 3) turning in homework on time; 4) paying attention and participating; 5) treating others with kindness; and 6) responding properly to authority as "good". *Id.* The teacher also rated Plaintiff's self-control as fair to good, and appropriateness of his behavior outside of class as fair. *Id.*

In May 2013[7], Plaintiff's first grade teacher at West Park Catholic Academy, Kathryn R. Gibson, completed a questionnaire for the Social Security Administration. (Tr. 204-13). She noted Plaintiff was in first grade, and was at grade-level in reading, math, and written language. (Tr. 204). Regarding Plaintiff's ability to care for himself, Ms. Gibson noted Plaintiff had weekly "obvious problem[s]"[8] with handling frustration, being patient, and responding to changes in his own mood. (Tr. 209). She assessed a "slight problem" in the areas of using good judgment, identifying and appropriately asserting emotional needs, using appropriate coping skills, and knowing when to ask for help. *Id.* She explained Plaintiff has trouble "express[ing] himself in relation to how others react to him", "will growl or shake" when frustrated, and taking turns is "a challenge for him." *Id.* Regarding attending and completing tasks, Ms. Gibson indicated Plaintiff had daily "obvious problems" with waiting to take turns, changing from one activity to another without being disruptive, and working without distracting himself or others. (Tr. 206). He had a "slight problem" paying attention when spoken to directly, refocusing, carrying out multi-step instructions, and working at a reasonable pace. *Id.* Ms. Gibson explained Plaintiff: "has no problem attending to self-selected or 'freetime' activities", but "[w]hen asked to follow multi-

---

7. In one place this evaluation is dated March 25, 2013 (Tr. 213), and in another it is dated May 25, 2013 (Tr. 211).
8. The rating key had a scale of one to five, with one indicating "no problem", two indicating "a slight problem", three indicating "a serious problem", four indicating "a serious problem", and five indicating "a very serious problem." *See, e.g.,* Tr. 209.

step directions he often becomes distracted" and "[h]e has some behaviors which also distract others in the class." *Id.* Ms. Gibson indicated in other areas of the questionnaire that Plaintiff only sits next to one person and is kept near the teacher "to help maintain his focus and minimize distractions to others." (Tr. 207). She stated Plaintiff "often moves as if on 'fast-forward'". (Tr. 208). Finally, Ms. Gibson noted Plaintiff's "repetitive gestures and vocalizations . . . sometimes illicit a negative response from his peers" and that these worsened over the course of the school year. (Tr. 211). She also stated Plaintiff "knows he should not repeat words and sounds . . . but he cannot help himself." *Id.*

In June 2013, Ms. Gibson completed a "School Activities Questionnaire". (Tr. 241-42). In it, she noted Plaintiff's attention span, ability to follow instructions, and ability to respond to criticism were "somewhat less" than others in the class. (Tr. 241). His ability to work independently, and to understand and complete assignments on time were "about the same" as others in his class. Similarly, his ability to learn reading, writing, and mathematics were "about the same with accommodations in place." *Id.* His ability to respond to change of routine was, however, "considerably less" than his classmates. *Id.* Ms. Gibson noted Plaintiff had been excluded from recess "several times related to arguments" and that he was "well-liked by his peers, however, they do react negatively when he produces random vocalizations." (Tr. 242).

In January 2014, Plaintiff was given a conduct warning for "hitting, punching, [and] poking" another student. (Tr. 248). Plaintiff said he was just playing. *Id.*

In May 2014, Plaintiff's teacher (Mrs. Link) wrote a letter to Plaintiff's attorney. (Tr. 253). In it, she described a November 2013 parent-teacher conference where she had discussed behavior related infractions ("talking and not participating fully in specials classes, threatening words to one classmate, and threatening gesture to another"). She also described a January 2014

11

conference where Copeland indicated "they were still trying to find a counselor who could help [Plaintiff]." *Id.* The teacher's "main concern at that conference was the incidents involving hitting and punching when the class was transitioning to recess to class", but "[b]y the end of January . . . [she] noticed an improvement in behavior and since then, [Plaintiff] has had only a few minor behavioral issues of any kind." *Id.*

In October 2014, Plaintiff's teacher sent home a note that Plaintiff had received "three strikes" for poor behavioral choices. (Tr. 273). He refused to do assigned work, and pushed in line at lunch. *Id.*

In November 2014, notes from a parent teacher conference noted areas of strength as "[g]ood effort on work" and "[a]sks for help when needed." (Tr. 255). In "[a]reas of [n]eed", it listed: 1) "[t]urning in work – missing work"; 2) "[o]organization"; 3) "[f]rustration / [a]nger management"; 4) "[n]eatness"; 5) "[t]alking at non-talking time"; and 6) "[s]taying in his seat". *Id.*

### Hearing Testimony and Personal Background

Plaintiff was born in April 2006, making him six years old at his filing date. (Tr. 172). At the time of the hearing, he was in third grade in regular classes. (Tr. 89). He lived at home with his parents and paternal grandparents. (Tr. 87).

Copeland testified Plaintiff was "very hyper", "can't complete tasks", "rapidly changes his mood within seconds", and "destroys [the] home and our things if he gets mad." (Tr. 88). Copeland stated Plaintiff "doesn't seem like" he has control over his conduct. *Id.* He does show remorse after bad behavior. (Tr. 90).

Plaintiff's school performance fluctuated between good and bad. (Tr. 89). Some days "he's really good" and "then there's days he doesn't listen." (Tr. 91). He "[s]ometimes" behaves

better in school than he does at home. *Id*. Sometimes it takes Plaintiff a "really long time" to do his homework and his parents "have to bribe him" with the promise of renting a movie or video game. (Tr. 91-92).

Plaintiff had broken a desk at school the previous year. (Tr. 98). Plaintiff had also been in trouble for "talking out of turn" and in his previous school, because he "hit[] somebody." (Tr. 99). Plaintiff had never been suspended. (Tr. 98).

Plaintiff had friends both in the neighborhood and at school, and participated in the Lego Club after school. (Tr. 90). He had been in six fights in the neighborhood that summer. (Tr. 93). He participated in sports during previous years but was "getting too violent". (Tr. 91). Plaintiff likes to play video games on his Wii U "[o]nce or twice a week." (Tr. 92).

Copeland testified Plaintiff is "really mean" to his grandfather, (but "sometimes" nice), and is nice to his grandmother. *Id*. When Plaintiff misbehaves, his parents punish him by grounding him, or taking his Legos or video games away. (Tr. 97-98). Plaintiff responds by "crying, yelling, kicking the walls, screaming at everybody and everything around him and eventually calming down after about 10-15 minutes." (Tr. 98).

Copeland testified Plaintiff looks both ways when he crosses the street, and takes care of his personal needs (brushing his teeth, showering, going to the bathroom), but needs reminders and supervision. (Tr. 92-93).

Plaintiff's parents had gotten him a puppy for Christmas. (Tr. 94). He was not physically cruel to the dog, but would scream at it. *Id*. Copeland testified Plaintiff was helping by cleaning up after the dog and taking it outside. *Id*. Plaintiff also keeps his room clean "to an extent". (Tr. 95). His Lego sets all have a place on the shelves, but he is less careful with other things. *Id*.

13

Copeland testified Plaintiff sometimes hurts himself: "hit[ting] himself in the head, pinch[ing] himself, [and] runs into walls purposely". (Tr. 101).

Plaintiff was taking Adderall twice per day and Quantazine three times per day. (Tr. 89). Copeland testified that without the medication "you can't even talk to him" because he will not listen. (Tr. 96).

### ALJ Decision

In a written decision, the ALJ concluded Plaintiff had not engaged in substantial gainful activity since his application date, and had severe impairments of oppositional defiant disorder ("ODD") with disruptive behavior, and attention deficit hyperactivity disorder ("ADHD"). (Tr. 65). The ALJ found Plaintiff did not have an impairment that met or medically equaled the severity of the listings. (Tr. 66). The ALJ then found Plaintiff did not have an impairment or combination of impairments that functionally equals the listings because he only had a marked limitation in one domain—interacting and relating with others. (Tr. 71-76). Therefore, the ALJ found Plaintiff not disabled. (Tr. 76).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r*

14

*of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for SSI is predicated on the existence of a disability. 42 U.S.C. § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). For claimants under the age of 18, the Commissioner follows a three-step evaluation process—found at 20 C.F.R. § 416.924(a)—to determine if a claimant is disabled:

1.    Is claimant engaged in a substantial gainful activity? If so, the claimant is not disabled regardless of their medical condition. If not, the analysis proceeds.

2.    Does claimant have a medically determinable, severe impairment, or a combination of impairments that is severe? For an individual under the age of 18, an impairment is not severe if it causes a slight abnormality or a combination of slight abnormalities which causes no more than minimal functional limitations. If there is no such impairment, the claimant is not disabled. If there is, the analysis proceeds.

3.    Does the severe impairment meet, medically equal, or functionally equal the criteria of one of the listed impairments? If so, the claimant is disabled. If not, the claimant is not disabled.

To determine whether an impairment or combination of impairments functionally equals a listed impairment, the minor claimant's functioning is assessed in six different functional domains. 20 C.F.R. § 416.926a(b)(1). If the impairment results in "marked" limitations in two domains of functioning, or an "extreme" limitation in one domain of functioning, then the

impairment is of listing-level severity and therefore functionally equal to the listings. *Id.* § 416.926a(a).

A "marked" limitation is one that is more than moderate but less than extreme, and interferes "seriously" with the ability to independently initiate, sustain, or complete activities. *Id.* § 416.926a(e)(2)(i). "It is the equivalent of functioning [one] would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean. *Id.* An "extreme" limitation is one that interferes "very seriously" with the ability to independently initiate, sustain, or complete activities. *Id.* § 416.926a(e)(3)(i). The six functionality domains are: 1) acquiring and using information, 2) attending and completing tasks, 3) interacting and relating with others, 4) moving about and manipulating objects, 5) caring for yourself, and 6) health and physical well-being. *Id.* § 416.926a(b)(1). In determining functional equivalence, the ALJ must consider the "whole child." Social Security Ruling 09–1p, 2009 WL 396031, at *2.

## DISCUSSION

Copeland raises three objections to the ALJ's decision: 1) the ALJ's finding that Plaintiff had less than marked limitation in the domains of caring for self and attending and completing tasks were not supported by substantial evidence; 2) the ALJ erred in his analysis of Ms. Stanford's opinion; and 3) new and material evidence warrants remand.

### *Functionality Domains*

#### *Caring for Self*

Copeland first contends the ALJ erred in not finding Plaintiff had a marked limitation in the domain of caring for oneself. The Commissioner responds that the ALJ's determination is supported by substantial evidence.

16

The "caring for yourself" domain includes "how well you maintain a healthy emotional and physical state, including how well you get your physical and emotional wants and needs met in appropriate ways; how you cope with stress and changes in your environment; and whether you take care of your own health, possessions, and living area." 20 C.F.R. § 416.926a(k); *see also* SSR 09-7p, 2009 WL 396029. The regulation provides, regarding school-aged children:

> You should be independent in most day-to-day activities (e.g., dressing yourself, bathing yourself), although you may still need to be reminded sometimes to do these routinely. You should begin to recognize that you are competent in doing some activities and that you have difficulty with others. You should be able to identify those circumstances when you feel good about yourself and when you feel bad. You should begin to develop understanding of what is right and wrong, and what is acceptable and unacceptable behavior. You should begin to demonstrate consistent control over your behavior, and you should be able to avoid behaviors that are unsafe or otherwise not good for you. You should begin to imitate more of the behavior of adults you know.

20 C.F.R. § 416.926a(k)(2)(iv); SSR 09-7p, 2009 WL 396029, *5.

Examples of limited function in caring for yourself (although such examples do not necessarily show marked or extreme limitation) include: 1) putting inedible objects in the mouth; 2) using self-soothing activities that show developmental regression (e.g., thumbsucking, re-chewing food) or have stereotyped mannerisms (e.g., body rocking, headbanging); 3) not dressing or bathing self appropriately for age; 4) engaging in self-injurious behavior (e.g. self-inflicted injury or refusal to take medication), or ignoring safety rules; 5) not spontaneously pursuing enjoyable activities or interests; or 6) disturbance in eating or sleeping patterns. 20 C.F.R. § 416.926a(k)(3)(i)-(vi).

When discussing the "caring for self" domain specifically, the ALJ cited the appropriate regulation and SSR 09-7p, including examples of limited functioning in those areas. (Tr. 75). He then concluded Plaintiff had less than marked limitation in the ability to care for himself, stating:

> The evidence shows the claimant was frustrated, impatient, and moved as if on fast forward carelessly. He had difficulty controlling vocalizations, repetitive

17

movements, and impulses when he wanted to something. The claimant had a minor head injury in December 2012 that required two stitches. The claimant reported he had been "messing around." No loss of consciousness was indicated.

*Id*.

The undersigned agrees with the Commissioner that the ALJ's conclusion that Plaintiff had less than marked impairment in caring for self is supported by substantial evidence. Although the ALJ's explanation could have been clearer, in the context of the definition of the domain, the explanation follows. For example, the ALJ's notation that Plaintiff "had difficulty controlling vocalizations, repetitive movements, and impulses when he wanted something" indicates the ALJ recognized Plaintiff did have *some* limitation in this domain, but concluded that it did not rise to the marked level. Next, the ALJ's reference to a minor head injury follows after the ALJ cites examples of limitations in this domain, including, "self-inflicted injury." (Tr. 75). Thus, the implication of mentioning that Plaintiff reported he had been "messing around" is that the injury was not self-inflicted and intentional, but rather an accident.

The ALJ's conclusion is supported by substantial evidence in the record as a whole. The ALJ gave "considerable weight" to the state agency reviewers who found Plaintiff did not have a marked impairment in this domain. (Tr. 71) (citing Tr. 120, 131). The ALJ also cited records that support this conclusion in his summary of the evidence at the beginning of the functional equivalence analysis. *See* Tr. 68 ("Tantrums were down to once daily. He was trying more at school but he was still talkative.") (citing Tr. 292); Tr. 68 ("His behavior was good in school.") (citing Tr. 298); Tr. 69 (noting stable GAF scores in the 61-70 range) (citing Tr. 446, 590); Tr. 70 (Plaintiff's teacher's evaluation of his limitations in caring for self "rated as none to obvious")

(citing Tr. 209).[9] Additionally, Copeland testified that Plaintiff is able to shower and brush his teeth independently (with some reminders and supervision) (Tr. 93), and that he looks both ways before crossing the street (Tr. 92). Again, this evidence as a whole shows that, while Plaintiff clearly had some limitation in the domain of caring for self, there is substantial record evidence to support the ALJ's conclusion that it was less than marked.

Although Copeland argues there was substantial evidence of "uncontrolled aggressive behavior" (Doc. 15, at 15), the ALJ's decision reflects that he considered these records, but did not agree that it showed behaviors not completely within Plaintiff's control. *See* Tr. 68 ("The Center for Families and Children suggested that the claimant's behavior has a volitional component and that his conduct improved with therapy, a combination of counseling and medication.") (citing *inter alia*, Tr. 306 (progress note that Plaintiff "has been trying to work through his behaviors more"); Tr. 313 ("continued hyperactivity and aggression in the PM. Behavior is good at school."); Tr. 319 (progress note stating teachers had reported improvement); Tr. 320 (progress note indicating Plaintiff stated school year ended "awesome"); *see also* Tr. 67 ("In January 2014, it was noted the claimant was doing better managing his

---

9. Notably, Plaintiff's teacher opined that he had problems in the domain of caring for self, but on a scale of one ("no problem") to five ("very serious problem"), she rated Plaintiff as a three ("an obvious problem") in three out of ten categories, and one ("no problem") or two ("a slight problem") in the remaining seven categories. (Tr. 209). With regard to this questionnaire, the ALJ summarized:

> In Domain #5 (caring for self), he was rated as none to obvious. He had difficulty reading others. He was frustrated at times, impatient, and had repetitive gestures and vocalizations that were distracting to self and others. He was calmer and more focused after taking medication. He had loss of appetite due to medication. He ate very little at school. He was described as kind-hearted and loving.

(Tr. 70).

temper at home.") (citing Tr. 488); Tr. 91 (Copeland's testimony that "[s]ometimes" there may be a volitional component to the way Plaintiff behaves at home).

The substantial evidence standard creates a "'zone of choice' within which [an ALJ] can act without the fear of court interference." *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001). Given the evidence discussed above, the undersigned concludes the ALJ did not err in his evaluation of this domain, and his decision falls with the "zone of choice" allowed by the substantial evidence standard. The ALJ did not find Plaintiff had *no* limitation in this domain—he discussed and acknowledged difficulties—but rather found that it was *less than marked*. Although there is certainly evidence to support Copeland's argument—and a contrary conclusion—the Court may not overturn "if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. It does here.

### Attending & Completing Tasks

Second, Copeland contends the ALJ erred in finding Plaintiff had a less than marked limitation in the functional domain of attending and completing tasks. The Commissioner responds that the ALJ's decision is supported by substantial evidence and that the evidence marshaled by Plaintiff does not compel a different conclusion.

The domain of "attending and completing tasks" addresses "how well you are able to focus and maintain your attention, and how well you begin, carry through, and finish your activities, including the pace at which you perform activities and the ease with which you change them." 20 C.F.R. § 416.926a(h); *see also* SSR 09-4p, 2009 WL 396033, at *2. For school-aged children, the regulation provides:

> When you are of school age, you should be able to focus your attention in a variety of situations in order to follow directions, remember and organize your

20

school materials, and complete classroom and homework assignments. You should be able to concentrate on details and not make careless mistakes in your work (beyond what would be expected in other children your age who do not have impairments). You should be able to change your activities or routines without distracting yourself or others, and stay on task and in place when appropriate. You should be able to sustain your attention well enough to participate in group sports, read by yourself, and complete family chores. You should also be able to complete a transition task (e.g., be ready for the school bus, change clothes after gym, change classrooms) without extra reminders and accommodation.

20 C.F.R. § 416.926a(h)(2)(iv). Examples of limited functioning in this area (although such examples do not necessarily describe a marked or extreme limitation) include being: 1) "easily startled, distracted, or overreactive to sounds, sights, movements or touch"; 2) "slow to focus on, or fail to complete activities of interest to you, e.g., games or art projects"; 3) easily "sidetracked from your activities or . . . frequently interrupt[ing] others"; 4) "easily frustrated and giv[ing] up on tasks, including ones you are capable of completing"; and 5) "requir[ing] extra supervision to keep you engaged in an activity." *Id.* § 416.926a(h)(3)(i)-(v).

In addressing this domain, the ALJ concluded Plaintiff had less than marked limitation, explaining:

> [Plaintiff] was diagnosed with ADHD and ODD. He was described as distracted when asked to do multistep tasks. Verbal outbursts and repetitive gestures also distracted him. There were no problems with free time activities. The claimant was impulsive with difficulty waiting turns and transitioning between activities. He needed reminders to stay on task at home but he could play with friends or play video games for a couple of hours at a time.

(Tr. 73).

Again, the ALJ did not find Plaintiff had *no* limitation in this domain, but rather that it was *less than marked*. The contrast drawn by the ALJ between being easily distracted when doing things Plaintiff did not want to do and being able to focus when doing things he did want to do strongly supports his conclusion that a limitation in this domain was less than marked. And it has the support of substantial evidence in the record. *See* Tr. 206 (teacher note that Plaintiff

21

"has no problem attending to self-selected or 'freetime' activities"); Tr. 70 (summarizing activities report from March 2013 and noting "Once he understood what [he] needed [t]o, he required little supervision. He could play for two hours at most at a time. He played well with his friends. . . . He could play video games for a few hours at a time.") (citing Tr. 195); Tr. 70 (noting Plaintiff was involved in basketball, baseball, boy scouts, and swimming lessons at various times) (citing Tr. 481, 577).

In her May 2013 evaluation of this domain, Ms. Gibson opined Plaintiff had an "obvious problem" in three areas of attending and completing tasks: taking turns, changing activities without being disruptive, and working without distracting self or others. (Tr. 206). She also opined, however, that Plaintiff had "no problem" sustaining attention during play/sports activities, completing assignments, organizing his things, or focusing long enough to finish an assigned task. *Id.* Other educational records support this conclusion as well. *See* Tr. 243 (noting relatively moderate accommodations to help Plaintiff focus and stay on task); Tr. 241 (Plaintiff's attention span and ability to follow instructions "somewhat less" than his classmates; ability to work independently "about the same" as his classmates). Additionally, in reaching his conclusions, the ALJ gave considerable weight to the opinion of the state agency physicians who found Plaintiff had a less than marked limitation in this domain. (Tr. 71) (citing Tr. 120, 130).

To be sure, there is also evidence to support Copeland's argument—and a contrary conclusion—in the record, but the Court's job is to determine whether there is substantial evidence, that is, "more than a scintilla of evidence but less than a preponderance" such that "a reasonable mind might accept [it] as adequate to support a conclusion." *Besaw*, 966 F.2d at 1030. This is so even if substantial evidence might support the opposite conclusion. *Jones*, 336 F.3d at 477. The undersigned finds the ALJ provided such substantial evidence here.

*Analysis of Ms. Stanford's Opinion*

Within his argument about the functionality domains, Copeland also contends the ALJ erred in his analysis of Ms. Stanford's opinion. The Commissioner responds that the ALJ properly evaluated Ms. Stanford's opinion.

Social Security regulations state that "[r]egardless of its source, we will evaluate every medical opinion we receive." 20 C.F.R. § 416.927(c). A "medical opinion" is defined by regulation as a "statement[] from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairments . . . ." *Id.* at (s) 416.927(a)(2). "Acceptable medical sources" includes licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. *Id.* at (s) 416.913(a)(1)-(5). The relevant Social Security Regulation also explains:

> The distinction between "acceptable medical sources" and other health care providers who are not "acceptable medical sources" is necessary for three reasons. First, we need evidence from "acceptable medical sources" to establish the existence of a medically determinable impairment. See 20 CFR 404.1513(a) and 416.913(a). Second, only "acceptable medical sources" can give us medical opinions. See 20 CFR 404.1527(a)(2) and 416.927(a)(2). Third, only "acceptable medical sources" can be considered treating sources, as defined in 20 CFR 404.1502 and 416.902, whose medical opinions may be entitled to controlling weight. See 20 CFR 404.1527(d) and 416.927(d).

> Making a distinction between "acceptable medical sources" and medical sources who are not "acceptable medical sources" facilitates the application of our rules on establishing the existence of an impairment, evaluating medical opinions, and who can be considered a treating source.

SSR 06-03p, 2006 WL 2329939, at *2. Opinions from those who are not "acceptable medical sources"—or as the regulations define them "other sources"—may be used by an ALJ to "show the severity of [a claimant's] impairment(s) and how it affects [the claimant's] ability to work." 20 C.F.R. (s) 404.913(d); *see also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007). Other source opinions are entitled to consideration by an ALJ, and an ALJ's decision

23

should reflect such consideration. *Cole v. Astrue,* 661 F.3d 931, 939 (6th Cir. 2011); *see also* SSR 06-03p, 2006 WL 2329939, at *3 (opinions from "other sources" "are important and should be evaluated on key issues such as impairment severity and functional effects, along with other relevant evidence in the file"). In other words, an ALJ "should explain the weight given to [such] opinions ... or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." SSR 06-03p, 2006 WL 2329939, at *6; *see also Cruse,* 502 F.3d at 541.

However, "SSR 06-03p . . . does not require that an adjudicator articulate 'good reasons' for the rejecting of an 'other source's' opinion[,]" as the ALJ must do when discounting an opinion by a treating source. *York v. Comm'r of Soc. Sec.,* 2014 WL 1213240, at *5 (S.D. Ohio) (citations omitted); *see also Clark ex rel. S.R.C. v. Comm'r of Soc. Sec. Admin.*, 2013 WL 3007154, at *9 (N.D. Ohio) ("An ALJ is not required to set forth good reasons for rejecting the opinion of a social worker."); *Steed v. Colvin*, 2016 WL 2016 WL 4479485, at *10 (N.D. Ohio) (noting, in evaluating the ALJ's treatment of a CPST provider, that "[w]hile the ALJ's explanation admittedly could have been more thorough, the *explanation* requirement, nevertheless, should not be construed as rigorously as the treating physician rule") (emphasis in original). To evaluate other source opinions, an ALJ may apply the factors set forth in 20 C.F.R. § 404.1527(c), *i.e.,* length of treatment history; consistency of the opinion with other evidence; supportability; and specialty or expertise in the medical field related to the individual's impairment(s). *Adams v. Colvin*, 2014 WL 5782993, at *8 (S.D.Ohio).

After summarizing the evidence of record, the ALJ stated:

As for the opinion evidence, the undersigned rejects the medical opinion of Sonia Stanford, CPST, case manager, regarding the claimant's marked functional

24

limitations (Ex. 13F). Her report is not consistent with the findings obtained from MetroHealth Medical Center, Center for Families and Children, Guidestone, and the claimant's school and teachers.

Only acceptable medical sources can be considered as having provided a treating source opinion that is entitled to controlling weight (20 CFR 404.1527(d) and 416.927(d)). SSR 06-3p clarifies medical sources by noting that information from these "other sources" cannot establish the existence of a medically determinable impairment. Instead, there must be evidence from an "acceptable medical source" for this purpose. However, information from such "other sources" may be based on special knowledge of the individual that provides insight into the severity of any impairments and their limiting [e]ffects.

(Tr. 71).

First, the ALJ is correct that Ms. Stanford is not an "acceptable medical source" qualified to offer a "medical opinion" under the regulations. As the Commissioner points out, the "CPST" Ms. Stanford signs after her name stands for "Community Psychiatric Supportive Treatment" and is not a medical title. The Ohio Administrative Code explains that CPST "provides an array of services delivered by community based, mobile individuals or multidisciplinary teams of professionals and trained others" where "[s]ervices address the individualized mental health needs of the client." Ohio Admin. Code 5122-29-17(A). Elsewhere, Ms. Stanford's title is "case worker" (Tr. 565), and in multiple places, she is referred to as a "QMHS", *see* Tr. 565, 605. As noted above, the Ohio Administrative Code defines "Qualified mental health specialist" (QMHS) as an individual "who is not required to perform duties covered under the scope of practice according to Ohio professional licensure . . . " *See* Ohio Admin. Code 5122–24-01 (Sept. 7, 2011). Ms. Stanford thus does not fall within the definition of an "acceptable medical source". Therefore, although the ALJ was required to consider Ms. Stanford's opinion, he was not—contrary to the implication in Copeland's argument—required to give "good reasons" for rejecting it as he would for a treating physician.

And the ALJ here did consider Ms. Stanford's opinion. After his thorough discussion of the record evidence, the ALJ stated he was rejecting Ms. Stanford's opinion—that Plaintiff had marked limitations in several domains—because it was inconsistent with the record. This conclusion is supported by the same substantial evidence cited above. For the same reasons that the ALJ's determination that Plaintiff had less than marked limitation in caring for self and attending and completing tasks is supported by substantial evidence, so is his rejection of Ms. Stanford's opinion that Plaintiff's limitations were marked. The ALJ considered Ms. Stanford's opinion as required by the regulations. He was required to do no more, his decision is supported by substantial evidence, and rejection of the opinion was not error.

***Sentence Six Remand***

Copeland's final contention is that remand is required under sentence six of 42 U.S.C. § 405(g) in light of new and material evidence, namely, additional evidence from Ohio Guidestone. The Commissioner responds that the evidence is not material, and that claimant has not demonstrated good cause.

A claimant must establish two prerequisites before a district court may order a sentence six remand. *Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 483-84 (6th Cir. 2006). A claimant must show: 1) the evidence at issue is both "new" and "material"; and 2) there is "good cause for the failure to incorporate such evidence into the record in a prior proceeding". 42 U.S.C. § 405(g); *see also Cline v. Comm'r of Soc. Sec*., 96 F.3d 146, 148 (6th Cir. 1996). Evidence is new only if it was "not in existence or available to the claimant at the time of the [prior] administrative proceeding". *Sullivan v. Finkelstein,* 496 U.S. 617, 626 (1990). Evidence is material only if there is "a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore v.*

*Sec'y of Health & Human Servs.*, 865 F.2d 709, 711. (6th Cir. 1988). A post-decision evaluation is not material if it is cumulative of evidence already in the record, or if it merely shows a worsening condition. *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 277–78 (6th Cir. 2010); *see also Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230. 1233 (6th Cir. 1993) (evidence not material where it shows "no marked departure from previous examinations").

The party seeking remand bears the burden of showing the two requirements are met. *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Additionally, the Sixth Circuit takes "a harder line on the good cause test" requiring a claimant "give a valid reason for his failure to obtain evidence prior to the hearing." *Courter v. Comm'r of Soc. Sec.*, 479 F. App'x 713, 725 (6th Cir. 2012) (quoting *Oliver v. Sec'y of Health & Hum. Servs.*, 804 F.2d 964, 966 (6th Cir. 1986)).

Here, Copeland seemingly points to two sets of allegedly new and material records. As to the evidence that post-dates the ALJ's decision, *see* Tr. 7-49, the undersigned agrees with the Appeals Council (and the Commissioner) that such evidence is not material. *See Oliver*, 804 F.2d at 966 (evidence from a later date not material to claimant's capabilities at the time of the ALJ's decision); *Ferguson*, 628 F.3d at 277-78 (evidence is immaterial if it does not speak to a claimant's condition at the relevant time); *see also* Tr. 2 (Appeals Council statement that "[t]his new information is about a later time. Therefore, it does not affect the decision about whether you were disabled beginning on or before March 11, 2015.").

As to the other evidence submitted to the Appeals Council[10], *see* Tr. 628-96, the undersigned agrees with the Commissioner that it is not material.[11] Copeland points to references

---

10. The Appeals Council did not directly address this evidence in its written decision, but did acknowledge it made the evidence part of the record. *See* Tr. 5.

in these records regarding Plaintiff having difficulty managing anger, behavioral problems at school, difficulty with homework, focus, and following directions, being disrespectful, and depressive symptoms. (Doc. 15, at 21) (citing Tr. 635, 643-45, 647, 649, 652-53, 655, 661, 665-67, 669-70). As a whole, these are not materially different than the records considered by the ALJ. *See* Tr. 68-76 (ALJ's consideration of records including, *inter alia*, tantrums, aggressive behavior, behavioral problems at school, yelling at his parents, refusing to complete school work, being easily distracted, and poor cooperation). Thus, as this evidence is merely cumulative of the evidence the ALJ considered, it is not material. *See Ferguson,* 628 F.3d at 277–78; *Casey*, 987 F.2d at 1233 (evidence is not material where it shows "no marked departure from previous examinations").[12]

---

11. Because the undersigned finds the evidence is not material, there is no need to address whether the evidence is "new" or whether there was "good cause" for failure to submit it earlier.

12. Although there is a single reference in the additional notes to "depressive symptoms" (Tr. 635) (note from Kristen Miceli, Case Worker) an allegation not considered by the ALJ, the undersigned finds the Commissioner's argument that this is not material well-taken. Ms. Miceli is not a specialist (her title is "case worker") and this is a single isolated reference in the record not supported by other medical evidence, or a diagnosis of depression. *See Glasco v. Comm'r of Soc. Sec.*, 645 F. App'x 432, 437 (6th Cir. 2016) ("This single reference to depression by a non-specialist without supporting medical evidence does not make it reasonably probable that the ALJ, who acknowledged similar references to a history of depression in the existing administrative record, would come to a different result on remand."). Although, unlike *Glasco*, the ALJ here did not have other references to a history of depression, there is also no medical evidence in the record to support a diagnosis of depression. And, moreover, there is only an single reference to "depressive symptoms" without a diagnosis of depression. *See id.* at 437 (noting the physician's "purported 'diagnosis' of depression was formed without the support of any medically acceptable clinical and laboratory diagnostic techniques."); *see also Sizemore,* 865 F.2d at 711–12 (medical assessment unsupported by "specific laboratory test or diagnostic procedure" is not entitled to deference and therefore would not make different result reasonably probable on remand). Therefore, this evidence is not material because it does not show "a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore*, 865 F.2d at 711.

28

Thus, the undersigned concludes Copeland has not satisfied his burden to show "a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore v. Sec'y of Health & Human Servs.*, 865 F.2d 709, 711. (6th Cir. 1988). As such, the request for a sentence six remand is denied.

CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision to deny SSI supported by substantial evidence. Accordingly the decision of the Commissioner is affirmed.

IT IS SO ORDERED

 s/James R. Knepp II
United States Magistrate Judge